IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN JOSEPH HOFFMEISTER, HOFFMEISTER HOMES, INC., A NEBRASKA CORPORATION<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF SCRIBNER, NEBRASKA, a political subdivision of the State of Nebraska, KENNETH W. THOMAS in his Official Capacity as Mayor of Scribner, Nebraska.<br><br>Defendant. | CASE NO._____<br><br><br><br>**COMPLAINT** |

COME NOW Plaintiffs, Joseph Hoffmeister and Hoffmeister Homes, Inc., a Nebraska corporation, by and through counsel, allege and state as follows:

### PARTIES

1. Plaintiff John Joseph Hoffmeister ("Joseph") is an individual and a resident of Nance County, Nebraska.

2. Plaintiff Hoffmeister Homes, Inc. ("Hoffmeister Homes") is a Nebraska corporation with a principal place of business Genoa, Nance County, Nebraska.

3. Defendant City of Scribner, Nebraska, ("Scribner" or the "City") is a municipality of the State of Nebraska and a City of the Second Class located in Dodge County, Nebraska.

4. Defendant Kenneth W. Thomas ("Mayor Thomas") is the Mayor of Scribner Nebraska. Mayor Thomas was first elected Mayor in 2017 and served as Mayor at all times relevant hereto.

### VENUE AND JURISDICTION

5. This Court has subject matter jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

6. This Court has personal jurisdiction over all parties to this action pursuant to Fed.

1

R. Civ. P. 4(k) and NEB. REV. STAT. §§ 25-5361(1)–(2).

7. Venue is proper in the District Court of Nebraska pursuant to 28 U.S.C. § 1391(b).

## FACTS

8. Hoffmeister Homes is a Nebraska corporation in the business of providing housing to disabled individuals, including individuals of all ages who suffer from mental impairments or handicaps.

9. In the fall of 2017, Hoffmeister Homes became aware that the Evangelical Lutheran Good Samaritan Society (the "Good Samaritan Society") intended to sell certain real property used by the Good Samaritan Society as a nursing home facility (the "Facility") located in Scribner, Nebraska.

10. The Facility included three buildings, one with 78 beds and two with 16 beds each, which the Good Samaritan Society previously operated as a nursing home for patients ages 65 and older.

11. Hoffmeister Homes entered into negotiations with the Good Samaritan Society to purchase the Facility.

12. Hoffmeister Homes intended to operate the Facility as an assisted living home for disabled individuals of all ages, including disabled individuals under the age of 65 and individuals needing respite care.

13. In January 2018, Hoffmeister Homes signed an agreement to purchase the Facility from the Good Samaritan Society (the "Purchase Agreement").

14. On or about January 18, 2018, Hoffmeister Homes applied for appropriate licenses with the Nebraska Department of Health and Human Services to operate the Facility as an assisted living facility.

15. In or around November 2017, Hoffmeister Homes began attempts to contact the City regarding its zoning permit application process in order to convert the Facility into an assisted living facility for all ages, including people with mental disabilities.

16. Joseph Hoffmeister ("Joseph") of Hoffmeister Homes attempted to reach various City Departments to talk to someone about the zoning permit application and was transferred to the City's Economic Development Director, Kathy Lodi ("Lodi").

17. Lodi told Joseph that a man named Martin Koopman ("Koopman") was the

chairman for Scribner's Nursing Home Task Force (the "Task Force"), a committee created by the City to determine its response to the Facility's closure.

18. The members of the Task Force were, upon information and belief, appointed by Mayor Thomas and approved by a vote of the City Council.

19. Funds from the State of Nebraska were to be used by the City, through the Task Force, to attract a new buyer for the Facility through the Local Option Municipal Economic Development Act.

20. According to Lodi, Hoffmeister Homes would need to request a zoning permit from Koopman for each building at the Facility to operate them as assisted living homes.

21. Joseph called Koopman's workplace several times and left voicemails identifying himself as a representative of Hoffmeister Homes, describing Hoffmeister Homes' intention to purchase the Facility, and requesting Koopman, as chairman of the Task Form return his calls. Joseph never received a return call.

22. Joseph and Hoffmeister Homes also repeatedly contacted members of the City Planning & Zoning Commission in order to file a permit, but never received a response.

23. On or about February 4, 2018, Lodi called Joseph to ask if he could attend a meeting with the Task Force on February 5, 2018 (the "Task Force Meeting") at 1:00 PM in the Scribner Municipal Office.

## THE TASK FORCE MEETING

24. Joseph and his assistant Angel Alvarez ("Alvarez") attended the Task Force Meeting as requested by Lodi.

25. There were about thirteen or fourteen people in attendance at the Task Force Meeting. Among those present were Mayor Thomas acting in his capacity as Mayor of the City, Koopman acting in his capacity as chairman of the Task Force, Lodi acting in his capacity as the City Economic and Development Director, several unidentified Task Force members, a realtor name Ronald Niewohner ("Niewohner"), at least one unknown city councilmember, and other unknown community representatives and officials.

26. At the beginning of the Task Force Meeting, the City officials in attendance introduced themselves in official capacity as officers and officials of the City of Scribner.

27. The Task Force Meeting was headed by Koopman and Mayor Thomas.

28. The Task Force told Joseph that the City had received a letter from the Good

Samaritan Society stating that Hoffmeister Homes was to be the new owner of the Facility, and wanted to know what his intentions were.

29. Koopman reported the Good Samaritan Society had informed the Task Force that Hoffmeister Homes was a "perfect buyer," and that Joseph was "on the same religious level as Good Samaritan." Koopman disagreed, stating Good Samaritan, "has you up here (with his hand up), and I don't even have you down here (lowering his hand to the floor)."

30. Joseph also informed the Task Force that Hoffmeister Homes' runs an assisted living facility in Genoa, Nebraska.

31. Koopman asked who Hoffmeister Homes banked with, and indicated the City intended to perform an investigation on Hoffmeister Homes' facility in Genoa to find out how many times rescue units and police were called to that facility.

32. Jospeh offered the Task Force the opportunity to visit his facility in Genoa, Nebraska so they could learn about his operation and get a better understanding of the type of facility. The Task Force was uninterested.

33. Mayor Thomas asked Joseph how he intended to operate the Facility; whether it would be a nursing home or an assisted living home and whether it would house individuals with mental illnesses.

34. Joseph explained that Hoffmeister Homes wanted a permit from the City and intended to operate the Facility as an assisted living home for disabled individuals of all ages, including individuals with mental handicaps and in need of respite care, and that Hoffmeister Homes would apply for a Medicaid waiver for low-income individuals.

35. Joseph told Mayor Thomas that Hoffmeister Homes applied for a standard ALF license and described how the "100" wing would be used for respite care and the "200" wing would be a standard assisted living facility. Because Joseph was aware of the need for more low-income housing in the community, Hoffmeister Homes intended the "300" wing to be both an assisted living facility and to provide low-income housing.

36. Upon learning that Hoffmeister Homes intended to provide housing for persons with disabilities, Koopman told Joseph the City would not allow an assisted living facility to operate and would not allow persons with disabilities to reside in Scribner, stating: "We do not want any of those people in the town."

37. When asked for clarification, Koopman responded with a story of a man with

schizophrenia whom the City removed from the town bank using City police. Koopman stated that the City of Scribner would not hire additional police officers to deal with mentally ill people, "chase after runaways" or "chase kids climbing out of windows," referring to mentally handicapped clients of Joseph and Hoffmeister Homes.

38. Koopman also told Joseph that Scribner did not want an "outbreak" like what had happened to the north of Scribner. Joseph later learned that Koopman was referring to an event in Ponca, Nebraska, where some disabled residents left an unrelated care facility and were lost for a time.

39. Mayor Thomas told Joseph the facility had been used for senior housing and that is what the facility was going to continue to be used for. Mayor Thomas then stated that he would only issue the permit if Hoffmeister Homes used the Facility buildings "for what they were originally intended for," and that if Hoffmeister planned to operate the Facility for anything other than a nursing home for the elderly, "I will not give you a permit to operate."

40. Joseph was told that the Task Force and City preferred the Facility be sold to develop housing instead of his proposed assisted living for disabled individuals.

41. Joseph was also told by the Task Force he would get no support from the City unless he gave the City signed documents showing he intends to continue to use the Facility "as is" and any proposal submitted to the zoning board in favor of assisted living would be "tossed out."

42. Mayor Thomas stated he supported an "Executive Order" to ensure the "right tenant" would occupy and use the Facility. Mayor Thomas was clear that the "right tenant" was neither Joseph, Hoffmeister Homes, nor any other person intending to provide housing for handicapped people under the age of 65.

43. The tone of the meeting remained hostile throughout. Attendees, including City Officials and Task Force members consistently referred to would-be disabled residents as "those people." Koopman told Joseph, "you can't tell me you're running a good operation," and alleged that Joseph did not know what he was doing. When Joseph described how he and Hoffmeister Homes intended to maintain the Facility using private payments, the Aged and Disabled Waiver program, and Social Security payments, Koopman called Joseph a liar.

44. The meeting lasted about two hours in total. Alvarez was the only person in attendance who kept notes of the meeting.

## AFTER THE MEETING

45. Because the Task Force and Mayor Thomas told Joseph at the Task Force Meeting they would not grant Hoffmeister Homes a zoning permit, Joseph sent an email to the Good Samaritan Society to withdraw from the Purchase Agreement

46. On or about April 16, 2018, Hoffmeister Homes sent the City a letter through its former counsel requesting copies of documents related to any communications between the City and himself, records or recordings of the Task Force Meeting, and building and zoning records for the Facility.

47. The City refused to provide any such documents or records.

48. The City denied ever holding such a meeting with Joseph. The City Attorney represented to Hoffmeister Homes that the Task Force Meeting was just some townspeople who got together and used the Scribner Municipal Office for a meeting place.

49. The City eventually provided notes written after the fact of the Task Force Meeting. These notes falsely state that Joseph gave the Task Force members an age restriction for residents in his proposed assisted living home.

50. On or around May 29, 2018, Good Samaritan Society sold the Facility to a new buyer, Wallen Properties, LLC ("Wallen Properties"), a Nebraska Limited Liability Company.

51. Wallen Properties was given a permit to operate the Facility as an apartment building rather than an assisted living facility or nursing home.

## ADMINISTRATIVE ACTIONS UNDER HUD AND NEOC

52. On or around July 27, 2018, Plaintiffs filed a housing discrimination complaint ("Housing Discrimination Complaint") with the Department of Housing and Urban Development ("HUD") and the Nebraska Equal Opportunity Commission ("NEOC"). Plaintiffs filed amended complaints on October 29, 2018 and on May 22, 2019.

53. Plaintiffs' Housing Discrimination Complaint alleged violations under §§ 804(c), 804(b) or (f), 804(a), and 804(a)/(b) of Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing Act of 1988.

54. On November 19, 2021, the NEOC released a Commission Determination and Charge ("Determination and Charge") based on a final investigatory report it had prepared.

55. The Determination and Charge stated the NEOC found reasonable cause to believe that discrimination took place and issued a charge of discrimination on behalf of the Plaintiffs

pursuant to Neb. Rev. Stat. § 20-333 of the Nebraska Fair Housing Act.

56. The charge from the NEOC stated the NEOC found it more likely than not that the City discriminated against the Plaintiffs on the basis of disability in denying or making housing unavailable, terms and conditions, discriminatory statements, and using ordinances to discriminate in zoning/land use.

57. The NEOC found it was more likely than not that the City's officials made discriminatory statements at the Task Force Meeting.

58. The NEOC found that it was more likely than not that the City acted purposefully to dissuade the Plaintiffs from applying for a zoning permit because of the disabled status of Hoffmeister Homes' proposed clients at the Facility and that this constituted a discriminatory act.

59. The NEOC sent a letter dated November 23, 2021, to the Plaintiffs and the City laying out the findings and options listed in the Determination and Charge.

60. Plaintiffs timely elected to pursue civil action pursuant to Neb. Rev. Stat. § 20-335.

61. Under Neb. Rev. Stat. § 20-340(2), within thirty days after a timely election to pursue civil action, the Nebraska Attorney General "shall commence and maintain, a civil action on behalf of the aggrieved person . . . ."

62. Despite its statutory duty, the Nebraska Attorney General refused to commence an action on behalf of Plaintiffs.

63. Because the Nebraska Attorney General failed to commence an action, the NEOC issued a final Administrative Dismissal ("Administrative Dismissal") on February 18, 2022. The Administrative Dismissal took effect on March 5, 2022, fifteen days after Hoffmeister's receipt of the Administrative Dismissal.

64. Plaintiffs has not yet received a notice of dismissal from HUD.

65. The NEOC is a Fair Housing Assistance Program ("FHAP") recipient. As a FHAP recipient, NEOC is certified by HUD pursuant to 42 U.S.C. § 3610(f).

66. FHAP is a program authorized under Subchapter I of the Federal Fair Housing Act. *See* 42 U.S.C. § 3616.

67. To maintain its certification under FHAP and 42 U.S.C. § 3610(f), NEOC must provide rights and remedies which are substantially equivalent to those created by the federal Fair Housing Act, specifically, 42 U.S.C. §§ 3610-3612.

68. Because NEOC is a FHAP recipient, NEOC's administrative proceedings toll the limitations period under 42 U.S.C. §§ 3610(f), 3613(a)(1)(B), § 3616 (authorizing cooperation with state agencies for FHA enforcement).

69. Because the Plaintiffs filed Complaints with HUD and the NEOC and because HUD referred his filed complaint to NEOC, Plaintiffs participated in administrative actions under the Federal Fair Housing Act. Such administrative actions tolled the limitations period contained in 42 U.S.C. § 3613(a)(1)(A).

## CAUSE OF ACTION:
## FEDERAL FAIR HOUING ACT DISCRIMINATION

The facts set force above incorporated herein by reference.

70. The Task Force Meeting was made up of representatives from the City, including Mayor Thomas, acting in their capacities as officers and officials of the City of Scribner.

71. The Task Force itself was a committee created by the City; its members were appointed by Mayor Thomas and approved by the City Council.

72. At the Task Force Meeting, the City, by and through its officers and officials, including Mayor Thomas, stated that it would not grant permits to Plaintiffs because Plaintiffs intended to provide housing for residents with disabilities.

73. The residents with disabilities whom Plaintiffs intended to provide housing for are handicapped within the meaning of the Fair Housing Act. *See* 42 U.S.C. § 3602(h).

74. The City, by and through its officers and officials, discriminated against the Plaintiffs and future handicapped residents of the Facility by refusing to grant a zoning permit and stating its preference against, and discrimination intention towards, individuals who are handicapped and towards the Plaintiffs for their association with individuals who are handicapped. *See* 42 U.S.C. § 3604(f)(1).

75. The City, through the Task Force, has made dwelling unavailable or denied housing to individuals because of a handicap or because of association with handicapped individuals. *See* 42 U.S.C. § 3604(f).

76. The City, through the Task Force, expressed a preference against handicapped residents and intent to discriminate against them by keeping them out of its jurisdictional area.

77. The City, through the Task Force, expressed a preference against the Plaintiffs due to their association with handicapped residents and future handicapped residents.

78. The City, through the Task Force, demonstrated and stated its unwillingness to grant zoning variances or permits due to the handicaps of future Facility residents.

79. As a result of the City's discriminatory refusal to grant the zoning permits and the discriminatory statements of its officers and officials, Plaintiffs were forced to rescind the Purchase Agreement with the Good Samaritan Society for the Facility.

80. As a result of the City's discriminatory refusal to grant the zoning permits and the discriminatory statements of its officers and officials, Plaintiffs were unable to provide housing to individuals with handicaps.

81. Through its discriminatory refusal to grant a zoning permit and the discriminatory statements of its officials, the City denied housing to persons with handicaps and made housing unavailable to persons with handicaps.

82. Plaintiffs were damaged by the City's discriminatory actions in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Hoffmeister and Hoffmeister Homes respectfully request this Court issue judgment in favor of Hoffmeister and Hoffmeister Homes on the above Count in this Complaint, and grant the following relief:

A. Actual damages pursuant to 42 U.S.C. § 3613(c)(1) in an amount to be determined at trial;

B. Punitive damages pursuant to 42 U.S.C. § 3613(c)(1) in an amount to be determined at trial;

C. A permanent injunction against future discriminatory acts pursuant to 42 U.S.C. § 3613(c)(1);

D. Attorney fees pursuant to 42 U.S.C. § 3613(c)(2); and

E. Costs pursuant to 42 U.S.C. § 3613(c)(2).

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

                                             John Joseph Hoffmeister and Hoffmeister Homes, Inc., a Nebraska Corporation, Plaintiffs

By: */s/ Jacob C. Garbison*
Jacob C. Garbison, #26789
Mattson Ricketts Law Firm
134 S. 13th Street, Suite 1200
Lincoln, NE 68508-1901
Phone No.: (402) 475-8433
Fax No.: (402) 475-0105
E-mail: jcg@mattsonricketts.com

10